ESTHER SALISBURY v. STATE DEPARTMENT OF SOCIAL SECURITY, DIVISION OF PUBLIC INSTITUTIONS, SCHOOL FOR FEEBLE MINDED.[1]

October 26, 1945.

No. 34,042.

[1]Reported in 20 N. W. (2d) 349.

*J. A. A. Burnquist,* Attorney General, *Victor H. Gran,* Assistant Attorney General, and *R. A. Woychik,* State Compensation Attorney, for relator.

*Gallagher & Madden,* for respondent.

MAGNEY, JUSTICE.

*Certiorari* to the industrial commission to review an order granting compensation for death.

Grover Salisbury had been continuously employed by relator, state of Minnesota, from 1919 until his death February 25, 1944, at its school for the feeble minded located at Faribault. He worked in the storeroom of the institution, his position being designated as store's clerk No. 3. His duties consisted of receiving and issuing supplies. Living quarters at the institution were furnished him and his wife, respondent herein. His regular working hours were from 8:00 to 12:00 in the forenoon and from 1:00 to 5:00 in the afternoon, but he was on duty 24 hours a day, if necessary, and thus subject to call after working hours.

The school for the feeble minded occupies 116 buildings. For a number of years prior to the fall of 1941, the grounds and buildings had been infested with pigeons. Not only had they become a nuisance because of the unclean conditions they created, requiring a great amount of work to remedy the situation, but they also caused damage to the eaves and gutters of the buildings. Various devices were tried to get rid of them, but without results. Finally, in the fall of 1941, W. S. Kingsley, superintendent of construction, who had charge of repairs to the buildings, suggested to Dr. Edward J. Engberg, the superintendent, that the only way to get rid of the pigeons was to shoot them. Dr. Engberg agreed. Kingsley then asked several of the men whom he knew to be good shots

about shooting the pigeons. On the witness stand he was asked: "And did you authorize and direct them to shoot these pigeons?" He answered: "Yes, sir, I did." One of the men he spoke to was Grover Salisbury. This was in September 1941. In a few weeks, by actual count, 485 pigeons were shot and killed by Salisbury and others. All the pigeon hunters were employes of the institution except one. From then on many other birds were disposed of in the same manner by the same persons. The men used their own guns. Kingsley gave seven boxes of shells belonging to him to Bill Manahan, one of the men. The others used their own shells. After some time Kingsley suggested to Dr. Engberg that the state buy a case of shells to reimburse the men who had used their own shells, and "then if there was some left I had them on hand for future use." Dr. Engberg agreed. The first requisition for a case of shells to be charged to repairs and replacement was turned down. C. S. Lewis, the steward, under whom Salisbury worked, took up the matter with the budget department in St. Paul at the suggestion of Dr. Engberg. After Lewis had explained the purpose of it, the department passed it as current expense. This second requisition was dated November 15, 1941. The name of Carl H. Swanson, the director of public institutions, was stamped on the requisition. The purchase order for 500 shells was made out February 4, 1942. When the case of shells arrived it came to the storeroom of which Salisbury was in charge. Salisbury was authorized to hand shells to the men who had been shooting pigeons, either to reimburse them or to shoot more pigeons. He was also authorized to use them himself. These shells were purchased and used for no other purpose than to shoot pigeons. When Dr. Engberg revoked the authorization to shoot after the accident here in question, four boxes of shells were still left in the storeroom. Two pigeons had been shot after the accident. Carl H. Swanson was not consulted about the pigeon shooting and knew nothing about it until after February 22, 1944, but he testified that details of management are usually left with the superintendent of the institution. Kingsley testified that not any of the shooting took

place during regular working hours, "unless * * * they happened to see a pigeon, they got their gun and shot them during working hours." Nothing had been said about taking time off from their regular work to shoot pigeons.

In the afternoon of February 22, 1944, Grover Salisbury was not working. It was a holiday, and he had a half day off. He took his shotgun and left his apartment. There can be no question that he intended to go out and shoot a pigeon or pigeons. He had done that several times previously. Shortly after he left the apartment a shot was heard, and Salisbury was found at the foot of a stairway near the entrance door with a gunshot wound in his abdomen, admittedly caused by an accidental discharge. Three days later, on February 25, 1944, he died.

■ Relator claims that the facts which we have related demonstrate that the injury and death of Salisbury did not arise out of and in the course of his employment and that his activity at the time of the accident was purely personal and private and in the nature of a sport, and neither incidental to nor related to his employment. In our opinion, the injury which resulted in the death of Salisbury arose out of and in the course of his employment. As recently as the case of Brusven v. Ballord, 217 Minn. 502, 14 N. W. (2d) 861, we reviewed the cases in this state bearing on the question whether an accident arose out of and in the course of a servant's employment. There is no necessity for a repeated statement. The finding of the commission that the accident arose out of and in the course of Salisbury's employment is well supported by the evidence. The pigeon shooting was authorized by the superintendent of the hospital and the superintendent of construction. The aim of the shooting was to preserve the property of the state, according to Dr. Engberg and Mr. Kingsley, and also to rid the premises of a filthy nuisance. Shells were furnished by the state for this purpose only and used for no other purpose. The conclusion must be sustained that at the time of the injury decedent was doing his work on his employer's premises, with its authorization, and that there was a causal connection between the work which

was delegated to him by his employer for its benefit and the resulting injury. In State ex rel. Duluth Brg. & Malting Co. v. District Court, 129 Minn. 176, 180, 151 N. W. 912, 914, this court made a statement which may appropriately be quoted here:

"* * * when a servant undertakes in the course of his employment, during the proper hours therefor, and in the proper place to do something in furtherance of his master's business, and meets with accidental injury therein, the trial court's finding, that the accident arose out of and in the course of employment, should not be disturbed, unless it is clear to us that the ordinary servant, in the same situation, would have no reasonable justification for believing that what he undertook to do when injured was within the scope of his implied duties."

Here, the shooting of the pigeons was not something personal to deceased. It was not done as a sport. It was done for the purpose of preserving relator's property, at the instance and with the approval of his superiors.

■ Relator also insists that respondent's claim is defeated by reason of the fact, as it claims, that deceased violated Minn. St. 1941, § 640.16 (Mason St. 1927, § 10803). This statute, among other provisions, makes it a felony for any person to take into any state institution or grounds any firearms without the consent of the board of control. The director of public institutions now exercises the duties formerly exercised by the state board of control. As respondent states, it is very apparent that the statute was enacted for the purpose of preventing the smuggling of firearms and explosives into state institutions. The severity of the punishment prescribed by the statute indicates this. Under the facts here, it can be truthfully said that the director did give his consent. The requisition for the shells to be used on the grounds of the institution for the purpose of shooting pigeons contains his stamped signature of approval. One of the shells so acquired through the requisition undoubtedly caused the death of the employe. There is little sense in saying that, although the taking of shells onto the premises is authorized, the taking in and use of the only

instrument suitable for their use is unauthorized and a violation of law. The evidence is sufficient to support the decision of the commission.

Respondent is allowed $250 as attorneys' fees in addition to statutory costs and disbursements.

Affirmed.

[1]Reported in 20 N. W. (2d) 332.